IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEITH A. SOMERS,

               Petitioner,                    No. CIV-04-0698 RRB KJM P

     vs.

TERESA SCHWARTZ,

               Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2002 denial of parole.  He contends that the finding of unsuitability cannot be supported under the "some evidence" standard and that the denial of parole violated his right to equal protection.

I.  Factual And Procedural Background

        On November 15, 1992, petitioner was convicted of second degree murder, gross vehicular manslaughter while intoxicated, evasion of a police officer which caused bodily injury and death, and driving while intoxicated, causing injury, after a prior driving while intoxicated. Answer, Ex. A.

/////

/////

1        The parole board relied on the facts of the offense as taken from the probation

2   report:

3        On November 15, 1982 [sic], at approximately 2:20 a.m., the
         defendant was observed driving a late model Jaguar erratically at a
4        high rate of speed out of Roxbury Night Club parking lot on Sunset
         Boulevard.  Instead of exiting the driveway of the lot, the
5        defendant's car jumped the curb causing several people to move
         out of his path.  The defendant's vehicle struck a hot dog cart
6        parked in front of the club causing a man standing behind the cart
         to leap backwards to avoid being struck.  Two sheriff's deputies in
7        a radio car observed the incident and pursued the defendant's
         vehicle which soon reached speeds of 70 to 80 miles per hour on
8        Sunset Boulevard.  He weaved [sic] in and out of the west bound
         lanes, passing on the right and entering the east bound lanes on
9        three separate occasions to get around stopped traffic.  At Horn
         Avenue and Sunset, the defendant's vehicle failed to make the
10       curve and skidded into east bound traffic colliding with a Chevette
         automobile being driven by Angel Lewis Ostrum . . . who was
11       killed upon being impaled with a portion of the steering wheel
         which severed his aorta.  Three passengers in the Chevette, a A.R.
12       Medina . . ., S. . . .Trikaa and William S. Clark . . . were also
         injured.  The momentum of the defendant's vehicle caused it to
13       continue travelling in the east bound lane colliding with a taxi cab
         causing minor injuries to Azatur . . . [Mkethech Topadzhikyan].
14       When deputies arrived moments later, they saw the defendant was
         inside his stopped vehicle.  When they told him to put his hands
15       where they could be seen, he kept reaching into the back of the car.
         He retrieved a cellular phone and made a phone call.  When the
16       deputy was able to open the driver's door of the defendant's
         vehicle . . ., he could instantly smell the strong odor of alcohol.
17       The defendant was reportedly talking on the phone, telling
         someone that he needed to be bailed out of jail.  The defendant was
18       not seriously injured.  He was finally freed from the car and taken
         . . . to be treated for minor lacerations.  His blood alcohol level at
19       3:50 a.m. was .14 percent and it was positive for cocaine.  A.R.
         Medina, a passenger in the victim's vehicle, suffered serious
20       injuries, fractures and internal injuries.  Passenger S. [Trikaa]
         suffered minor injuries.  Passenger William S. Clark suffered
21       minor injuries.

22   Answer, Ex. B at 15-17[1]; see also Pet., Ex. C at 1.

23       Petitioner sought collateral review of the denial of parole first in Los Angeles

24   County Superior Court, then in the Court of Appeal for the Second Appellate District and finally

25   _____

26       [1] References to pages of Exhibit B are to the numbers provided at the top of the page.

1     in the California Supreme Court.  Pet., Apps. B-D.[2]

2     II.  <u>Standards Under The AEDPA</u>

3              An application for a writ of habeas corpus by a person in custody under a

4 judgment of a state court can be granted only for violations of the Constitution or laws of the

5 United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

6 claim decided on the merits in state court proceedings unless the state court's adjudication of the

7 claim:

8          (1) resulted in a decision that was contrary to, or involved an
         unreasonable application of, clearly established federal law, as
9          determined by the Supreme Court of the United States; or

10          (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
11          State court proceeding.

12 28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  <u>See</u> <u>Ramirez v. Castro</u>,

13 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

14 under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

15 Amendment rights and that § 2254(d) does not preclude relief); <u>see also</u> <u>Lockyer v. Andrade</u>, 538

16 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

17 not address the merits of petitioner's Eighth Amendment claim).[3]  Courts are not required to

18 address the merits of a particular claim, but may simply deny a habeas application on the ground

19 that relief is precluded by 28 U.S.C. § 2254(d).  <u>Lockyer</u>, 538 U.S. at 71 (overruling <u>Van Tran v.</u>

20 <u>Lindsey</u>, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

21 _____

22       [2]  The petition attaches both Exhibits and Appendices.

23       [3]  In <u>Bell v. Jarvis</u>, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
claims will have no determinative effect in the case before us . . .  At best, it is constitutional
24 dicta."  However, to the extent <u>Bell</u> stands for the proposition that a § 2254 petitioner may obtain
relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
25 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
of the Constitution before he or she may obtain habeas relief.  <u>See</u> <u>Lockyer</u>, 538 U.S. at 70-71;
26 <u>Ramirez</u>, 365 F.3d at 773-75.

1   courts to review state court decisions for error before determining whether relief is precluded by

2   § 2254(d).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

3   by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

4          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

5   different.  As the Supreme Court has explained:

6                A federal habeas court may issue the writ under the "contrary to"
               clause if the state court applies a rule different from the governing
7              law set forth in our cases, or if it decides a case differently than we
               have done on a set of materially indistinguishable facts.  The court
8              may grant relief under the "unreasonable application" clause if the
               state court correctly identifies the governing legal principle from
9              our decisions but unreasonably applies it to the facts of the
               particular case.  The focus of the latter inquiry is on whether the
10             state court's application of clearly established federal law is
               objectively unreasonable, and we stressed in Williams [v. Taylor,
11             529 U.S. 362 (2000)] that an unreasonable application is different
               from an incorrect one.

12

13  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

14  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

15  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

16  (2002).

17         The court will look to the last reasoned state court decision in determining

18  whether the law applied to a particular claim by the state courts was contrary to the law set forth

19  in the cases of the United States Supreme Court or whether an unreasonable application of such

20  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court fails

21  to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional

22  or federal law, the Ninth Circuit has held that this court must perform an independent review of

23  the record to ascertain whether the state court decision was objectively unreasonable.  Himes v.

24  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court

25  applied the correct law, and analyzes whether the decision of the state court was based on an

26  objectively unreasonable application of that law.

1    It is appropriate to look to lower federal court decisions to determine what law has

2  been "clearly established" by the Supreme Court and the reasonableness of a particular

3  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

4  III.  Parole In California

5    In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 11 (1979), the United

6  States Supreme Court found that an inmate has "no constitutional or inherent right" to parole,

7  even when a state establishes a system of conditional release from confinement.  The Court

8  recognized, however, that the structure of parole statutes might give rise to a liberty interest in

9  parole that would, in turn, mean an inmate was entitled to certain procedural protections.  Id. at

10  14-15.  In Greenholtz, the Court found that the "mandatory language and the structure of the

11  Nebraska statute at issue" created such a liberty interest.  Board of Pardons v. Allen (Allen), 482

12  U.S. 369, 371 (1987).

13    In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit used the

14  Greenholtz-Allen framework to determine whether California statutes created a liberty interest in

15  parole.  The critical statute at issue in McQuillion is California Penal Code section 3041, which

16  provides in relevant part:

17    (a) In the case of any prisoner sentenced pursuant to any provision
     of law, other than [the determinate sentencing law], the Board of
18    Prison Terms shall meet with each such inmate during the third
     year of incarceration for the purposes of reviewing the inmate's
19    file, making recommendations, and documenting activities and
     conduct pertinent to granting or withholding post-conviction credit.
20    One year prior to the inmate's minimum eligible parole release date
     a panel consisting of at least two commissioners of the Board of
21    Prison Terms shall again meet with the inmate and shall normally
     set a parole release date as provided in Section 3041.5.[4] The release
22    date shall be set in a manner that will provide uniform terms for
     offenses of similar gravity and magnitude in respect to their threat
23    to the public, and that will comply with the sentencing rules that
     the Judicial Council may issue and any sentencing information
24    relevant to the setting of parole release dates. The board shall

25

26    [4] Cal. Penal Code § 3041.5 establishes procedural requirements for Board hearings.

> establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime....
>
> (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041.  The Ninth Circuit found that subdivision (b) was like the statutes in both Greenholtz and Allen:

> California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme "'creates a presumption that parole release will be granted'" unless the statutorily defined determinations are made.

McQuillion, 306 F.3d at 901-02.  Again in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003), the Court of Appeals reiterated its holding that the California parole scheme created a liberty interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the question because its "language clearly parallels the language" under consideration in Greenholtz and Allen.  See also In re Rosenkrantz, 29 Cal.4th 616, 654 (2002) (discussing § 3041(b), the California Supreme Court noted "parole applicants . . . have an expectation that they will be granted parole unless the Board finds . . . that they are unsuitable in light of the circumstances specified by statute and regulation").

        The existence of a liberty interest means that a decision to deny parole must be supported by some evidence and not be otherwise arbitrary.  Superintendent, Massachusetts Correctional Institute, Walpole v. Hill, 472 U.S. 445, 457 (1985); Jancsek v. Oregon Board of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  The test is "not whether some evidence supports the *reasons* . . . for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." In re Lee, 143 Cal.App.4th 1400, 1408 (2006) (emphasis in original).  The evidence must have some indicia of reliability.  Biggs, 334 F.3d at 915.  The

1   "some evidence" requirement is a "minimally stringent" standard and does not require the court

2   to reweigh the evidence or examine the entire record.  Powell v. Gomez, 33 F.3d 39, 40 (9th Cir.

3   1994); Hill, 472 U.S. at 455-56.

> [The] analysis is framed by the statutes and regulations governing
> parole suitability determinations . . . . [W]e must look to California
> law to determine the findings that are necessary to deem a prisoner
> unsuitable for parole, and then must review the record in order to
> determine whether the state court decision holding that these
> findings were supported by "some evidence" . . . constituted an
> unreasonable application of the "some evidence standard" principle
> articulated in *Hill*. . .

Irons v. Carey, ___ F.3d ___, 2007 WL 2027359, *3 (9th Cir. July 13, 2007).

The Board's regulations for setting parole release dates are found in title 15 of the

California Code of Regulations.  Section 2401 of this title provides:

> A life prisoner shall be considered for parole for the first time at
> the initial parole consideration hearing scheduled as provided in
> Section 2268. A parole date shall be denied if the prisoner is found
> unsuitable for parole under Section 2402(c). A parole date shall be
> set if the prisoner is found suitable for parole under Section
> 2402(d). A parole date set under this article shall be set in a manner
> that provides uniform terms for offenses of similar gravity and
> magnitude with respect to the threat to the public.
>
> In setting the parole date the panel shall consider the Sentencing
> Rules for the Superior Courts. The panel shall also consider the
> criteria and guidelines set forth in this article for determining the
> suitability for parole and the setting of parole dates, considering the
> number of victims of the crime for which the prisoner was
> sentenced and any other circumstances in mitigation or
> aggravation.
>
> The terms in this article are guidelines only. The suggested terms
> serve as the starting point for the board's consideration of each case
> on an individual basis. The board may establish a term above or
> below the guidelines when warranted and reasons are stated on the
> record. A prisoner shall not be released before the minimum
> eligible parole date.

15 Cal. Code Regs. § 2401.

/////

/////

7

Section 2402 provides:

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

/////

/////

8

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

/////

9

1       (7) Age. The prisoner's present age reduces the probability of
recidivism.

2

3       (8) Understanding and Plans for Future. The prisoner has made
realistic plans for release or has developed marketable skills that
can be put to use upon release.

4

5       (9) Institutional Behavior. Institutional activities indicate an
enhanced ability to function within the law upon release.

6   15 Cal. Code Regs. § 2402.

7       Once the Board determines that an inmate is suitable for parole, it proceeds to set

8   a date for the inmate's release, based on numerous factors provided in sections 2403 through

9   2411.  The paramount concern in determining parole suitability is public safety.  In re

10   Dannenberg, 34 Cal.4th 1061 (2005); see also id. at 1080, 1084, 1085, 1086 ("the overriding

11   statutory concern" is for public safety; purpose of the statutes is to "guarantee that the Board has

12   fully addressed the public safety implications" of the release determination).

13   IV.  Liberty Interest In Parole

14       Respondent argues that because petitioner has no liberty interest in parole, the

15   denial of parole raises no federal question.  The Ninth Circuit has found such an interest and has

16   reaffirmed this conclusion.  Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th

17   Cir. 2006); McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

18   V.  The Board's Decision And The State Courts' Denials

19       The Board of Prison declined to set a parole date for petitioner on the following

20   grounds:

21       PRESIDING COMMISSIONER BORDONARO:  We're back on
the record in the case of Mr. Somers . . . . The Panel has reviewed

22       all the information received from the public and relied on the
following circumstances in concluding that the prisoner is not yet

23       suitable for parole and he would pose an unreasonable risk of
danger to society or a threat to public safety if released from

24       prison.  The commitment offense was carried out in an [e]specially
cruel manner.  Multiple victims were injured or killed in the

25       incident.  The incident was carried out in a manner which
demonstrates a callous disregard for human suffering.  These

26       conclusions are drawn from the Statement of Facts wherein the

inmate was driving his Jaguar erratically at a high rate of speed.  It was the early morning hours of November 15th, 1992.  He had struck a hot dog cart, continued on, was pursued by sheriff's deputies.  He was weaving in and out of lanes, passing on the right.  He failed to make a curve, skidded into traffic, collided with another car and killed the victim, Angel Ostrum, who was killed upon that impact.  Three other passengers were also injured.  His previous record is not extensive.  He did have one arrest, nothing as a juvenile, first of all.  His prior criminality consists of a conviction for DUI and then a local ordinance of some sort when he was originally arrested for having a loaded weapon in the car, however, he did have a permit and pled to a lesser charge.  There was [sic] a couple of traffic citations that were also given to him.  He did received [sic] probation for both of his convictions.  While institutionalized, he has done very well.  He's had only four 128s [general disciplinary chrono], the last one of those in 1998 for failure to comply with grooming standards.  Those go back to '95.  He has had no 115s [Rules Violation Reports].  He's not yet fully participated, however, in beneficial self-help and therapy programming, but I will note a little bit later on that he is doing extremely well.  The psychiatric report, which is dated 12/7/2001, authored by an E. Rueschenberg, indicates that at the present time, the inmate's overall risk for future violence in the community appears to be within the low to moderate range and it appears to be diminishing as time progresses.  I believe this is generally favorable, however, it is not totally supportive of release, but, again, is a pretty good psychological evaluation.  His parole plans, he does, apparently, have a place to stay in the last county of legal residence.  He doesn't have any specific job offer, per se, but he does seem to have skills.  He also has family in Pennsylvania which are extremely supportive of his release.  The Hearing Panel does note that the responses to the 3042 Notices indicate there is an opposition to a finding of suitability, specifically from the Los Angeles District Attorney's Office.  The correctional counselor writes that it's not predictable, at this time, and did not make a stand, if I can say it in that manner.  The Panel does make the following findings, that the prisoner does need self-help and therapy programming in order to face, discuss, understand and cope with stress in a non-destructive manner.  Until progress is made, he continues to be unpredictable and a threat to others.  He should be commended for not having any 115s during his entire period of incarceration.  He's had extensive self-help, everything from sign language to Yolk [sic] Fellows, Impact, Life Plan seminars, it goes on, a lot of different Bible study course [sic], fellowship ministry classes, peer education program concerning infectious diseases and he's been in AA and NA.  He was in that, apparently, since around '96.  However, these positive aspects of his behavior do not yet outweigh the factors of unsuitability.  And I'm going to do something I normally don't do and that's give you a one year denial, Mr. Somers.  In the next year, we ask that you continue your good programming, that you remain disciplinary free

and that, as it becomes available to you, to upgrade . . ., to continue participating in self-help and therapy programming. . . .

DEPUTY COMMISSIONER MACKENBERG: I want to tell you that we don't consider you to be a person that's going to spend all of his life in prison.  We think that you've done exceptionally well with your program so far.  You know you're just not yet to that date.  You're doing a hell of a job. One thing that is not necessarily noted in these remarks, over and over, as you pointed out, you've been in one on one therapy repeatedly, so you've got a [indiscernible] of therapy.  It's just not revealed necessarily in all the paperwork that we keep seeing, so it looks like it's all self-help and not something beyond that.  But apparently, you've extended yourself beyond that.  I'm not quite sure what you'll do.  One on one is about as good as it gets, unless you get into group therapy. But I think Mr. Bordonaro is pointing out to you that although you're in AA and you've participated in it extensively, we would like to have seen a more organized program, but acknowledging at the time that there aren't any.  So I don't know what you do about that next, unless there is something more that you can do.  I think you've done a whacking good program . . . .

PRESIDING COMMISSIONER BORDONARO: . . . This is your initial, so we had a lot of options open to us on what to do, including setting a parole date and considered that at this time, however, again, it was a horrendous crime and that's the main reason. . . . . [Y]ou've been [at] CDC since '93 and you've done more self-help than somebody I've seen that's been down 20 years . . . . I think you need a little more time in that recovery type of program.  Unfortunately, the only thing we have is AA and I'm not trying to downplay AA, but as far as an intensive substance abuse program, there's just nothing available.

Answer, Ex. B at 52-58.

/////

/////

/////

/////

/////

/////

/////

/////

1    The Superior Court denied petitioner's application for habeas relief, citing to the

2  "pivotal consideration" of public safety:

3       Upon individualized consideration, the particular circumstances of
        the inmate's commitment offense may be a basis for finding the
4       inmate unsuitable for parole.

5       The Board took the entire record into consideration, including
        petitioner's offense, his laudatory chronos as well as the long list of
6       completed programs.  The Board, however, denied petitioner's
        parole suitability and set the next suitability hearing in one year.
7       There is no evidence that the Board made its decision in an
        arbitrary or capricious manner.

8

9  Pet., App. B at 2 (internal citations omitted).  The Court of Appeal denied the petition with

10 citations to In re Powell, 45 Cal.3d 894, 904 (1988) and Perveler v. Estelle, 974 F.2d 1132, 1134

11 (9th Cir. 1992); both cases discuss the "some evidence" standard.  Pet., App. C.  The Supreme

12 Court denied the petition without citation to authority.  Pet., App. D.

13 VI.  The Denial Of Parole And Due Process

14    A.  The Nature Of The Offense

15       In Dannenberg, the California Supreme Court recognized:

16       [T]he nature of the prisoner's offense, alone, can constitute a
         sufficient basis for denying parole.  While neither the Board nor
17       the Governor may adopt a blanket no-parole policy for particular
         offenses, we said, the [parole] authority properly may weigh
18       heavily the degree of violence used and the amount of viciousness
         shown by a defendant.
19
         However, we cautioned, sole reliance on the commitment offense
20       might, in particular cases, violate section 3041, subdivision (a)'s
         provision that a parole date "shall normally be set" under "uniform
21       term" principles, and might thus also contravene the inmate's
         constitutionally protected expectation of parole. We explained that
22       such a violation could occur, for example[,] where no
         circumstances of the offense reasonably could be considered more
23       aggravated or violent than the minimum necessary to sustain a
         conviction for that offense.  We suggested that, in order to prevent
24       the parole authority's case-by-case suitability determinations from
         swallowing the rule that parole should "normally" be granted, an
25       offense must be "particularly egregious" to justify the denial of
         parole.

26

1    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3       Our discussion, including our use of the phrase "particularly
egregious," conveyed only that the violence or viciousness of the
4       inmate's crime must be more than minimally necessary to convict
him of the offense for which he is confined.

5

6 34 Cal. 4th at 1094-95 (internal citations & quotations omitted).

7       The Board found petitioner's offense heinous because multiple victims were

8 injured or killed during the incident and petitioner demonstrated a callous disregard for human

9 suffering.  See 15 Cal.Code Regs. § 2402(c)(1)(A), (D).  Petitioner argues that his offense was

10 not among the gravest of murders because he had not intended to kill anyone, did not

11 intentionally attack multiple victims, and acted with gross negligence.  Pet., Supp. at 4.[5]

12       There is no evidence that petitioner demonstrated a callous disregard for human

13 suffering; it appears that the victim died on impact or shortly thereafter.  In re Smith, 114

14 Cal.App.4th 343, 367 (2003) (second degree murder found not to be "callous" because there was

15 no evidence that the victim was tormented or terrorized).  The state court applied federal law

16 unreasonably in finding that this factor was supported by some evidence.

17       There is no dispute that there were multiple victims of the accident: Angel Ostrum

18 was killed, the other three people in Ostrum's car were injured, and a cab driver was injured

19 when the impact caused petitioner's car to spin off the road and hit the cab.

20       In In re Weider, 145 Cal.App.4th 570, 575 (2006), the defendant shot his wife's

21 paramour in a restaurant and, during the struggle for the gun, wounded two other patrons.  The

22 Court of Appeal considered the parole board's reliance on the fact that the defendant had injured

23

24      [5]  In People v. Watson, 30 Cal.3d 290, 300-01 (1981), the California Supreme Court held
that a defendant could be charged with second degree implied malice murder as the result of a
25 fatal accident; in this case, the jury found that petitioner acted with implied malice, not just gross
negligence, during his flight from the police.
26

1  others during the crime as a reason to deny parole:

2          The existence of multiple victims in this case is the inadvertent
           result of Weider's perpetrating the crime in a restaurant during
3          business hours.  As we held in *Weider I*, the fact that there were
           multiple victims, which will never change, cannot be sufficient to
4          deny parole to Weider forever.

5  Id. at 589.  The court did not suggest, however, that the existence of multiple victims, even

6  inadvertent victims, could not be a sufficient reason for an initial denial of parole.[6]

7          In light of the deferential nature of the "some evidence" standard, this court does

8  not find that the state court unreasonably applied federal law in this instance.  However, because

9  of the tenuous connection between danger and the fact that petitioner hit a car carrying four

10  people instead of one person and thereafter spun into another car, continuing reliance in the

11  future on this factor to show dangerousness may pose constitutional problems.  Id.; see also

12  Answer, Ex. B at 56 (". . . the distance between you and that crime is going to only play in your

13  favor as time goes by.").

14          B.  Petitioner's Record

15          It is not entirely clear from the record whether the Board relied on petitioner's

16  record in denying parole.  In stating the reasons for denial, the presiding commissioner

17  mentioned petitioner's record, but recognized that it was "not extensive."  Answer, Ex. B at 53.

18  The regulations suggest that the lack of a juvenile record and the lack of a record of violent or

19  assaultive offenses are suitability factors.  To the extent that the Board relied on petitioner's

20  record to deny parole, this factor is not supported by the requisite some evidence.  See id., Ex. B

21  at 56 ("it was a horrendous crime and that's the main reason").  To the extent that the state court

22  /////

23  /////

24

25          [6]  In re Weider, 2005 WL 40042 (Cal.App. 6th Dist. 2005) (Weider I), an unpublished
26  decision, considered petitioner's second parole hearing, after the petitioner had stipulated to a
   two-year denial between the two hearings.

15

1   similarly relied on petitioner's record in its determination, it unreasonably applied federal law.

2   See Pet., App. B at 2 ("Significant factors are the gravity of the current convicted offense and the

3   timing and gravity of current and past convicted offenses.").

4           C.  Psychological Factors

5           A psychological report prepared for the Board hearing contained the following

6   conclusion:

7           Mr. Somers does not appear to be an individual who is criminally
            oriented or prone to violent behavior.  The index offense was a
8           crime involving gross negligence and poor judgment, with Mr.
            Somers consuming large quantities of alcohol, placing himself
9           behind the wheel of his car, and then exhibiting reckless and
            irresponsible behavior, trying to evade police officers who were in
10          pursuit.  As a result, Mr. Somers lost control of his car, collided
            with another vehicle, and killed another individual.  The main
11          contributing factors to the offense appear to have been problems
            with substance abuse and a low-level of self-awareness and
12          maturity, with Mr. Somers not recognizing the severity of his
            condition, or the possible consequences of his behavior.
13
            During his incarceration in prison, Mr. Somers appears to be
14          making substantial progress, in terms of his level of maturity, his
            recognition of flaws in his personality, and a recognition of his
15          need to maintain lifetime sobriety.  At present time, his overall risk
            for future violence in the community appears to be within the low
16          to moderate range of severity, and it appears to be diminishing as
            time progresses.
17
            Although Mr. Somers is a GP inmate and he is therefore not in
18          need of mental health treatment, he could benefit from self-
            improvement programming, as available.  Mr. Somers appears to
19          be highly motivated to program in the areas of self-improvement.
            His record indicates that he had received numerous laudatory
20          chronos for his participation in various group activities and
            volunteer activities.  It is also recommended that he continue his
21          participation in recovery programming.

22   Pet., Ex. B at 7.

23           The Post-Conviction Progress Report prepared on October 12, 2001, also noted

24   that petitioner "does not suffer from any significant mental illness."  Id., Ex. C at 9.

25           The Board recognized petitioner's extensive participation in self-help programs;

26   indeed, as noted, presiding commissioner Bordonaro recognized that petitioner had participated

                                        16

in "more self-help than somebody . . . that's been down 20 years . . . ."  Answer, Ex. B at 57.  He

added that,

> I think you need a little more time in that recovery type of a
> program.  Unfortunately, the only thing we have is AA and I'm not
> trying to downplay AA, but as far as intensive substance abuse
> program, there's just nothing available.  That's out of the BPT's
> hands.  That's something that we would like to think more of
> which, unfortunately, we don't have control over CDC.  And so
> that puts you in a rock and a hard place, but I think you're doing a
> great job with what you've got.

Id., Ex. B at 58.  As noted above as well, Deputy Commissioner Mackenberg observed:

> One thing that is not necessarily noted in these remarks, over and
> over, as you pointed out, you've been in one on one therapy, so
> you've got a [indiscernible] of therapy.  It's just not revealed
> necessarily in all the paperwork that we keep seeing, so it looks
> like it's all self-help and not something beyond that.  But
> apparently, you've extended yourself beyond that.  I'm not quite
> sure what you'll do.  One on one is about as good as it gets, unless
> you get into group therapy.  But I think Mr. Bordonaro is pointing
> out to you that although you're in AA and you've participated in it
> extensively, we would like to have seen a more organized program,
> but acknowledging at the same time that there aren't any.

Id., Ex. B at 55-56.  In a chrono from 1997, David Roy, L.C.S.W., noted that petitioner had been

attending outpatient sessions since 1994, has "worked consistently and hard on crisis situations

and overall stabilization," and "would benefit by continuing this process."  Pet., Ex. D at 1.  A

number of other chronos praise his participation in AA.  Id., Ex. D at 2-8.

Nevertheless, the Board found petitioner was not suitable for parole because "he's

not yet fully participated . . . in beneficial self-help and therapy programming."  Answer, Ex. B at

53.

In Greenholtz, 442 U.S. at 15, 16, the Supreme Court found that when there is a

liberty interest in parole, due process requires that the inmate eligible for parole be given an

opportunity to be heard and a statement of why "he falls short of qualifying for parole," which

serves "as a guide to the inmate for his future behavior."  In this case, the Board denied petitioner

/////

1   parole in part because it felt he should pursue counseling, which it recognized was not available

2   to him.  This reason for the denial cannot be a "guide . . . for his future behavior."

3          In addition, in <u>Superintendent</u>, 472 U.S. at 457, the Supreme Court recognized

4   that a determination violates due process if it is without evidentiary support or is "otherwise

5   arbitrary."  Merriam-Webster defines "arbitrary," in relevant part, as "depending on individual

6   discretion . . . based on or determined by individual preference or convenience rather than by

7   necessity or the intrinsic nature of something."  <u>See</u> <<u>http://www.m-w.com/dictionary/arbitrary</u>>

8   (accessed 7/27/07).   A denial based on petitioner's failure to pursue unavailable programming is

9   arbitrary because it is discretionary and a departure from the "intrinsic nature" of things in the

10  prison context.

11         Accordingly, the California court unreasonably applied federal law in determining

12  that the denial of parole on this ground was not arbitrary and capricious.

13         D.  <u>Factors Favoring Suitability</u>

14         Petitioner's record contains many of the factors favoring suitability.  He has no

15  juvenile record, 15 Cal. Code Regs. § 2042(d)(1); Pet., Ex. C (Life Prisoner Evaluation Report)

16  at 2; he comes from a stable family background and has, for the most part, maintained stable

17  relationships, 15 Cal. Code Regs § 2042(d)(2); Pet., Exs. B (Psychosocial Assessment) at 1 & C

18  at 2; Answer, Ex. B at 22 (married while incarcerated but now divorced), 25 (in touch with

19  family); he is remorseful about the crime, 15 Cal. Code Regs § 2042(d)(3); Pet., Ex. B at 6

20  (genuine feelings of regret and remorse); he has realistic plans for release, including a place to

21  live with a family friend, and the intent to get off of disability as soon as possible and return to

22  work using his established skills once his physical problems have been overcome, 15 Cal. Code

23  Regs § 2042(d)(8); Answer, Ex. B at 40-41; his institutional behavior shows an ability to

24  function within the law upon release, 15 Cal. Code Regs § 2042(d)(9); Answer, Ex. B at 29-33

25  (listing activities and certificates and noting petitioner had received no disciplinary write-ups);

26  Pet., Ex. D (chronos documenting petitioner's participation).

1    VII.  The Denial Of Parole And Equal Protection

2              Petitioner argues that his right to equal protection of the law was violated because

3    the Board applied the parole provisions "unevenly in a systematic and/or irrational manner."

4    The basis of this argument is not entirely clear, but it seems to be based on the irrationality of the

5    Board in determining that the murder in this case was more egregious than other second degree

6    murders and in otherwise determining that petitioner is not yet ready for parole, matters covered

7    in the preceding sections.

8    VIII.  Resolution

9              As the Supreme Court has recognized, the determination whether to parole an

10   inmate is a "discretionary assessment of a multiplicity of imponderables, entailing primarily what

11   a man is and what he may become rather than simply what he has done."  Greenholtz, 442 U.S. at

12   10 (internal citations, quotation omitted).  In determining that the Board did not act in an

13   arbitrary and capricious manner, the state court noted that the Board had taken a number of

14   factors into account, all but one of which this court has found to be unsupported or to be

15   arbitrary.  Thus this court must find that the state court applied federal law unreasonably in using

16   impermissible factors to determine that the Board had acted reasonably.

17             When a court has found that some of the factors relied on by the Board are neither

18   supported nor supportable, a remand "with directions to proceed in accordance with due process"

19   may be appropriate.  In re DeLuna, 126 Cal.App.4th 585, 598 (2005).  In light of the number of

20   factors favoring petitioner's suitability for parole, acknowledged by the Board itself, and the

21   determination that several of the factors favoring unsuitability were not supported or were

22   arbitrary, such a remand is appropriate.

23             IT IS HEREBY ORDERED that:

24             1.  The Federal Defender's Office be appointed to represent petitioner; and

25             2.  The Clerk of the Court is directed to serve a copy of this order on David Porter,

26   Assistant Federal Defender.

        IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be granted to the extent that the Board of Prison Terms be directed to hold a new hearing in accordance with due process.  It is also recommended that this court retain jurisdiction of any habeas petition, properly exhausted, stemming from this renewed hearing.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 27, 2007.

_____
U.S. MAGISTRATE JUDGE

2/some0698.157